GLACIER STATE TELEPHONE COM-
PANY, An Alaskan Public Utility
Corporation, Appellant,

v.

ALASKA PUBLIC UTILITIES
COMMISSION, Appellee.

No. S–856.

Supreme Court of Alaska.

Sept. 5, 1986.

Michael G. Briggs and Debra J. Brandwein, Guess & Rudd, Anchorage, for appellant.

Mark L. Figura, Asst. Atty. Gen., Anchorage, Harold M. Brown, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This case arises from a telephone company's request for a rate increase. The issues presented primarily involve the methodology employed by the Alaska Public Utilities Commission in computing the company's revenue requirements.

### I. *Background.*

Glacier State Telephone Company (GSTC) operates a telephone utility in the Kenai Peninsula, Kodiak, North Pole, Nenana, and Delta Junction areas. GSTC is regulated by the Alaska Public Utilities Commission (APUC or the "commission") pursuant to AS 42.05.141.

On May 22, 1981, GSTC filed Tariff Advice Letter (TA) No. 151–49 seeking permanent rate relief and requesting authorization to implement an interim tariff billing structure to produce $1,039,184. GSTC claimed that its rate of return was so low as to be confiscatory. On July 6, 1981, GSTC's application for permanent rate relief was suspended pursuant to AS 42.05.-421 for "an initial six-month period."

On December 23, 1981, the commission staff filed a petition requesting that the commission suspend TA 151–49 for an additional six months. The APUC granted the petition.

On January 18, 1982, GSTC filed Tariff Advice Letter No. 154–49, seeking interim rate relief, subject to refund, in the annual amount of $271,307. The APUC granted the interim rate relief, stating that "GSTC has made a satisfactory showing that its existing rates are confiscatorily low."

On July 6, 1982, the parties stipulated to extend the suspension of TA 151–49 from July 7, 1982 to July 28, 1982. On July 26, the APUC again extended the suspension period until November 7, 1982. On October 7, the commission staff filed a petition requesting a further extension of time, and the APUC again extended the suspension period until May 7, 1983.

The GSTC filed its rate case on a "total company" basis, combining interstate toll, intrastate toll, and local exchange components. The commission staff recalculated GSTC's revenue requirement by separating the interstate and intrastate toll and local exchange components, then considered only the local exchange component. Since GSTC's revenue deficiency was caused by a low rate of return on GSTC's toll business, use of this method eliminated GSTC's entire revenue requirement under TA 151–49.

At a public hearing on June 2, 1982, the commission requested the parties to brief the jurisdictional question raised by the staff's "recalculation." On October 4, 1982, the APUC entered Order No. 11, adopting a separated company approach to ratemaking for local exchange carriers in Alaska and requiring that the revenue requirement of local exchange carriers be based on their local exchange operations only.

On November 2, 1982, GSTC filed Tariff Advice Letter No. 160–49, seeking further

interim rate relief, to make up the difference between the earlier interim relief granted on March 3, 1982 and the amount of the original rate relief sought. The commission summarily rejected TA 160–49 because it did not "follow mandatory jurisdictional allocation requirements."

On May 9, 1983, the APUC issued Order No. 14. Order No. 14 required GSTC to prepare and file a calculation of the revenue requirement and permanent rates, and provided that the "permanent rates subsequently approved by the Commission shall be effective for billings rendered on or after the date of this Order."

On November 7, 1983, the APUC issued Order No. 17, requiring GSTC to (1) decrease its current tariff rates by 11.44 percent on an across-the-board basis, effective May 9, 1983; (2) refund those revenues collected in excess of the permanent rates granted in Order 17 from May 9, 1983 to the effective date of Order 17; and (3) refund all amounts collected under the interim rates granted earlier.

GSTC appealed the APUC's orders 11, 14, and 17 to the superior court. The superior court subsequently issued an order upholding the APUC's decisions.

GSTC now appeals the superior court's affirmance of the challenged orders of the APUC.

## II. *Separated Methodology.*

GSTC contends that the APUC erred in computing its revenue requirements on a separated basis. The APUC analyzed GSTC's revenue data in a form that separates interstate toll, intrastate toll, and local exchange components. GSTC claims that the APUC and the superior court misunderstood *United States v. RCA Alaska Communications, Inc.*, 597 P.2d 489 (Alaska 1979) (*"Alascom"*), and that the APUC should have determined revenue rates on a total company basis. The APUC argues that whether or not *Alascom* actually required it to use a separated methodology, considerations of fairness and proper utility regulatory policy led it to use this system. We conclude that although a separated methodology was not mandated by *Alascom*, it was within the authority of the APUC to require such methodology in this case.[1]

GSTC argues that the facts of this case distinguish it from *Alascom*. In *Alascom*, we held that the separated methodology was mandated in a situation where the interstate component earned a high rate of return and the intrastate component earned a confiscatory rate, which GSTC calls a "toll-excess situation."[2] In other words, the utility sought to have its interstate business subsidize its intrastate operations. The telephone company in *Alascom*, as a toll carrier company, is regulated by the Federal Communications Commission (FCC) as to its interstate toll operations and by the APUC as to its intrastate toll operations. *See* 47 U.S.C.A. § 152(a) (West 1962 & Supp.1986). GSTC, on the other hand, is a "toll-deficient company," realizing a low rate of return on its interstate toll operations. GSTC seeks to have its local exchange rates subsidize its interstate and intrastate toll operations. The APUC has complete jurisdiction over GSTC, a local exchange carrier. *See* 47 U.S.C.A. § 221(b) (West 1962).

---

**1.** The appropriate standard of review for the APUC's decision is the "substitution of judgment test," since this is a question of law where no expertise is involved. *Jager v. State*, 537 P.2d 1100, 1107 n. 23 (Alaska 1975).

**2.** In *Alascom*, we held that the APUC was required to use the separation methodology prescribed in 3 AAC 48.430, which now states:

*Jurisdictional Separations.* The February, 1971, edition of the Separations Manual (standard procedure for separating telephone property costs, revenues, expenses, taxes, and re-

serves) published by the National Association of Regulatory Utility Commissioners, and as amended by the Federal Communications Commission through July 1, 1983, is adopted by reference. The property costs, revenues, expenses, taxes, and reserves of each telephone utility will be allocated in accordance with the principles and procedures set out in the manual, including the amendments noted above, for use by the commission in establishing rates for telephone utilities.

The consequence of these factual distinctions, according to GSTC, is that in this case the bases for requiring separation in *Alascom,* to avoid preemption of federal law and a burden on interstate commerce, do not exist. GSTC argues extensively that federal preemption and commerce clause issues are missing from this case. In fact, the APUC does not disagree with this analysis. Its counsel conceded at the superior court argument that this case does not involve commerce clause issues, and it does not argue the federal preemption issue at this level.[3]

*Alascom* does contain dictum that separation is required when intrastate revenues might subsidize interstate toll operations. *Alascom* quotes *Simpson v. Shepard,* 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511 (1913), (*The "Minnesota Rate Cases"*) which states:

> The reason, as [stated in *Smyth v. Ames*], is that the state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, *and, on the other hand, the carrier cannot justify unreasonably high rates on domestic business because only in that way is it able to meet losses on its interstate business.*

230 U.S. at 435, 33 S.Ct. at 755, 57 L.Ed. at 1556 (emphasis added), *quoting Smyth v. Ames,* 169 U.S. 466, 541, 18 S.Ct. 418, 431, 42 L.Ed. 819, 847 (1898). Neither *Alascom, The Minnesota Rate Cases,* nor *Smyth v. Ames* offers any reason why a utility cannot use intrastate revenues to subsidize interstate business. The language is dicta in all three cases.[4]

■ Nevertheless, we are of the view that the APUC was not required to use a total company approach. A public service commission is an administrative agency that has whatever powers are expressly granted to it by the legislature or conferred upon it by implication as necessarily incident to the exercise of powers expressly granted. *Greater Anchorage Area Borough v. City of Anchorage,* 504 P.2d 1027, 1033 n. 19 (Alaska 1972), *quoting State v. Department of Transportation of Washington,* 33 Wash.2d 448, 206 P.2d 456, 474–75 (1949). The essence of the administrative power conferred upon the APUC is regulatory. *Id.* at 1033. Among the commission's powers are setting rates, promulgating regulations, collecting information, and processing complaints. *Id.; see also* AS 42.05.141(a)(3). It is clearly within the APUC's authority to decide that it wants telephone rates to reflect only the costs of the service provided a ratepayer.

The commission stated that one consideration underlying its decision was the determination to reaffirm its policy to not intervene in the negotiations process regarding intrastate toll settlements. The APUC emphasized that the local exchange company should make every attempt to settle its disputes with Alascom (the long-distance carrier) regarding intrastate tolls before filing a complaint with the commission. APUC's policy is to refuse to allow the use of local exchange revenues as a substitute for a negotiated toll deficiency.

The APUC argues also that basic fairness to ratepayers is a reasonable basis for its decision. In fact, at some point this policy of fairness is mandated by statute. AS 42.05.391(a) forbids a utility to maintain unreasonable discriminatory rates between classes of services. AS 42.05.391(a) states in part:

---

**3.** In the context of state taxes that burden interstate commerce, Professor Tribe states:

> [The U.S. Supreme] court has consistently struck down those state taxes which it concludes unjustifiably benefit local commerce at the expense of out-of-state commerce. In contrast, state taxes which favor out-of-state commerce at the expense of local commerce are not similarly suspect. (emphasis omitted)

L. Tribe, American Constitutional Law § 6–16, at 354–55 (1978).

**4.** In *Elkhart Telephone Co. v. State Corporation Commission,* 7 Kan.App.2d 235, 640 P.2d 335 (1982), the court held that these three cases compelled separation in a case analogous to this one, where a total company approach would have resulted in intrastate revenues subsidizing interstate business.

A public utility may not, as to rates, grant an unreasonable preference or advantage to any of its customers or subject a customer to an unreasonable prejudice or disadvantage. A public utility may not establish or maintain an unreasonable difference as to rates, either as between localities or between classes of service.

■ Discrimination based on justifiable differences in the cost of service or discrimination that is otherwise reasonable is permissible; however, when the rate structure is such that one class of customers subsidizes another, discrimination may pass beyond its permitted scope and become unreasonable. *Jager v. State*, 537 P.2d 1100, 1109–10 (Alaska 1975). GSTC wants local exchange ratepayers to cover an interstate and intrastate toll deficit of nearly $2 million per year. Clearly this might be considered an unreasonable difference as to rates between classes of customers.

■ It is unnecessary for us to determine whether GSTC's suggested rate structure would violate 42.05.391(a), however, because the APUC's policies of nonintervention in intrastate toll settlements and fairness to ratepayers are reasonable bases for its decision to require separation in this case. We hold therefore, that by virtue of its authority to set rates and create regulatory policy, the commission acted within its power.[5]

**5.** While policy determinations are properly made in a rulemaking proceeding, GSTC received notice that the APUC was considering a separated methodology requirement and argued the issue both in the proceedings below and in another docket. Therefore, it had the same opportunity to contribute to the APUC's decision as it would have had in a rulemaking proceeding.

We find also that the APUC had a reasonable basis for its decision to apply a double leverage methodology, to assure that the utility's rate of return reflected its true risks and costs.

**6.** AS 42.05.421 provides in part: ·
*Suspension of Tariff Filing.*
(a) When a tariff filing is made ... the commission may ... conduct a hearing to deter-

### III. *Twenty-Two Month Suspension of the Tariff Filings.*

GSTC argues that the APUC was not authorized to suspend its tariff revision filings five times.[6] This delay "harmed" GSTC because the commission ultimately based its determination on financial data two years beyond the test period. Had the APUC been limited in its ability to suspend tariff filings, the rate case would have gone to hearing at a time of "unprecedented high interest rates" and its rate of return would have been substantially greater.

The APUC counters that the delay in the proceedings below was justified by its consideration of the important issue of separated company vs. total company methodology, and by "a number of other complexities" of GSTC's operations in the underlying case. Furthermore, the APUC argues that GSTC had no vested right to rates based on unprecedented high interest rates that were a short-term aberration.

The commission acknowledged in one of its suspension orders that this is an unusual case, and suggested that GSTC apply for additional interim relief if necessary:

In further extending the suspension of these rate increase requests, the Commission recognizes that the prolonged nature of this proceeding may impose an additional financial burden on GSTC. The Commission further acknowledges that this proceeding has continued for a

mine the reasonableness and propriety of the filing. Pending such a hearing the commission may ... suspend the operation of the tariff filing for
(1) an initial period not longer than six months beyond the time when it would otherwise go into effect if the annual gross revenues of the utility making the filing are more than $3,000,000.00;

·        ·        ·        ·        ·

(2)(b) An order suspending a tariff filing may be vacated if after investigation, the commission finds that it is in all respects proper. Otherwise the commission shall hold a hearing on the suspended filing and issue its order, before the end of the suspension period, granting, denying or modifying the suspended tariff in whole or in part.

longer period of time than under normal circumstances due to the quantity and breadth of the issues addressed, e.g., total versus separated company revenue requirement determination. Therefore, if GSTC finds that additional interim rate relief is needed, it should submit its request together with its fully separated revenue requirement study in accordance with 3 AAC 48.275(a) and 3 AAC 48.430, by November 5, 1982.

GSTC considers interim rate relief "an empty remedy." It sought interim relief on November 2, 1982, and the APUC rejected it because it was not filed on a separated basis. Thus, GSTC claims, it was caught in a classic "Catch 22" situation.

This characterization is unfounded, however. Presumably, if GSTC's revenue figures had warranted interim rate relief when considered on a separated company basis, it would have refiled using that methodology. If GSTC was not entitled to further interim rate relief based on its separated company data, then neither would it have been entitled to a rate increase had the commission come to an earlier decision. Thus its "Catch 22" situation was not a result of the suspensions, it was the result of the commission's decision to require a separated company methodology.

■ While we do not condone the extensive delays in this case, they were not inherently unfair given the complexity of the separations issue and the availability of interim relief if warranted. We hold that the commission did not err in suspending GSTC's tariff filings,[7] and the fact that interest rates dropped from the time GSTC filed the tariff to the time the APUC made its final decision does not entitle GSTC to an analysis based on the higher rates.

IV. *Proper Choice of Market Data.*

■ In a related issue, GSTC argues that the commission erred in analyzing market conditions at the time of the hearing and using these as the bases for setting a proper rate of return, because the data was two years beyond the test year used in the tariff revision that it originally filed. The result was that the APUC used May 1983 financial data to support a retroactive refund order dating back to a time of much higher interest rates, and to support the prospective order. We hold that the commission was correct in applying the most recent data to set the prospective rate of return, but that it erred in applying the updated information retroactively to adjust the interim rate award.

The New Mexico Supreme Court faced the former issue when a telephone company complained of a power commission's failure to use the latest available figures in setting its rates. *Mountain States Telephone v. New Mexico State Corporation Commission,* 90 N.M. 325, 563 P.2d 588 (1977). The court held that the commission should consider the most recent figures available:

> Quite obviously the most recent figures would be the most reliable in determining adequate utility rates. This case has been in progress since April of 1975, a period of almost twenty-four months. It would be unreasonable to ignore the actual experience during that period of time in arriving at new rates.

*Id.,* 563 P.2d at 603.

We agree with the reasoning of *Mountain States Telephone.* The commission has a duty to set a reasonable rate of return for the utility. "A rate of return may be reasonable at one time, and become too high or too low by changes affecting opportunities for investment, the money market, and business conditions generally." *In re Rates and Charges of Mountain States Telephone and Telegraph,* 99 N.M. 1, 653 P.2d 501, 508 (1982), *quoting Bluefield Waterworks & I. Co. v. Public Ser-*

---

7. GSTC does not argue that the APUC lacked authority under AS 42.05.421 to suspend tariff revisions for more than six months. Rather GSTC argues that the authority of APUC to suspend tariff filings is not "unfettered"—it is suffi-

cient to note that we do not necessarily agree with a reading of AS 42.05.421 which would permit the APUC to suspend tariff revisions for more than six months.

*vice Commission,* 262 U.S. 679, 693, 43 S.Ct. 675, 679, 67 L.Ed. 1176, 1183 (1923). The APUC was obliged to consider the drop in interest rates in the two years since the tariff was filed; it would have done the public a disservice had it ignored the change.

There is no satisfactory justification for applying its updated rate retroactively, however. The commission's task is to set a rate that is fair and reasonable at the time it is applicable. Therefore, on remand the commission should base the rate of return for the interim award on the market conditions that existed at the time the award was granted.[8]

## V. *System Operating Division Charges.*

Finally, GSTC maintains that the APUC erred in holding that its system operating division charges should be excluded from its revenue requirement. The commission reduced the revenue requirement by the amount of these expenses because it found that GSTC had failed to meet its burden of proving that these expenses were necessary, in the public interest, and reasonably based. We find that the commission erred in disallowing all of these charges and remand on this issue.

▪ The expenses at issue consist of public relations, executive, accounting/finance, legal, and personnel expenses incurred by GSTC's parent, Continental Telephone Service Corporation. Apparently it is difficult to directly allocate portions of a parent company's expenses to individual operating subsidiaries. The APUC staff and GSTC disagreed about exactly how to apportion these costs, but neither suggested that GSTC was not entitled to include some of these expenses in its revenue requirement.

The commission held that the expenses should be excluded because GSTC had failed to meet its burden of proof under AS 42.05.511(c). This statute provides that:

> In a rate proceeding the utility involved has the burden of proving that any written or unwritten contract or arrangement it may have with any of its affiliated interests for the furnishing of any services or for the purchase, sale, lease or exchange of any property is necessary and consistent with the public interest and that the payment made therefor, or consideration given, is reasonably based, in part, upon the submission of satisfactory proof as to the cost to the affiliated interest of furnishing the service or property and, in part, upon the estimated cost the utility would have incurred if it furnished the service or property with its own personnel and capital.

The issue is whether the APUC was required to allow at least some of the expenses, since it is likely that at least some of them were valid. The commission maintains that since GSTC failed to provide the proof required by AS 42.05.511(c), it was authorized to completely eliminate the claimed expenses from GSTC's revenue requirement. GSTC argues that the commission was compelled at least to accept the recommendation of its staff that the requested charges only be reduced.

The APUC's decision was unnecessarily harsh. On remand, the commission should consider the expenses recommended by its staff and by GSTC, and accept those it finds to be reasonable given the factors stated in AS 42.05.511(c).

---

**8.** GSTC also contends that the APUC erred in considering interest rates lower than those presented at the hearing because it had no opportunity to cross-examine any witnesses regarding use of the lower rates. GSTC argues that even if the APUC may judicially notice a fact capable of accurate and ready determination, GSTC was not given a reasonable opportunity to refute the lower interest rate. *See* AS 44.62.480. The error is harmless, however, as GSTC does not argue that interest rates did not drop, or that the financial records noticed by the commission were inaccurate. *See Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough,* 527 P.2d 447, 451 (Alaska 1974) (Superior court's failure to observe proper procedure in taking judicial notice was harmless error where its omission did not cause a failure of proof; on no occasion did appellants argue that the photocopies were inaccurate).

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.